OPINION OF THE COURT
 

 Simons, J.
 

 Defendant appeals from an order of the Appellate Division which denied without a hearing his motion pursuant to CPL 440.10 to set aside a judgment convicting him of murder in the second degree. He alleged several grounds for relief but we find merit only in his allegation that the People failed to preserve and deliver
 
 Brady
 
 material to him before trial after assuring him they would do so. Accordingly, we remit for a hearing to determine if the People made such representations, whether the material allegedly withheld was exculpatory and if so, whether there is a reasonable probability that the verdict would have been changed had the jury heard it.
 

 Defendant has been convicted after a jury trial of the 1988 murder of his seven-week-old son under circumstances evincing a depraved indifference to human life (Penal Law § 125.25 [2]). The death certificate assigned the cause of death to a massive brain hemorrhage due to a fractured skull. The coroner’s pathologists filed two autopsy reports and a third report was filed by a pathologist from the State Police forensic team who had examined the skull and brain tissue of the victim. Though the reports differed somewhat, their findings were generally consistent with the cause of death stated on the death certificate.
 

 It was the theory of the prosecution that defendant, while caring for his son, inflicted serious injuries on him causing his death. Defendant, on the other hand, contended the death was accidental. He admitted that he had dropped the infant to the floor while he was caring for him and that he had subsequently shaken him in the belief that the child was choking, but he contended that he did not intentionally or recklessly injure him.
 

 Because the incident took place when defendant and the victim were alone, the proof of depraved indifference rested
 
 *127
 
 largely on the nature of the injuries and their possible causes. The coroner’s pathologists testified they had observed a fracture to the front of the skull during the autopsy and other medical experts called by the People, relying on X rays of the infant’s head, confirmed that finding. The fracture was described as running from the anterior fontanelle of the head to the bridge of the nose: in the words the prosecutor used to the jury the "frontal bone [of the infant’s head was] split in half. Fractured. Cut in two. As a result of a traumatic blow to his head.”
 

 On direct, the prosecutor elicited testimony from his medical experts that the fracture could not have been accidental and that the hemorrhage of the infant’s brain resulted from excessive blows to the head. One expert concluded that a fracture like the one observed on the front of the infant’s skull could result only from the application of force equivalent to that which a body might experience from being dropped from a second story window or being involved in a high speed auto accident.
 

 Defendant called two medical experts who testified that after examining the CAT scans, X rays and autopsy results they found no evidence of a fracture to the frontal bone. They concluded that the medical evidence was consistent with defendant’s assertion that the death was accidental.
 

 Although defendant had requested the skull and samples of brain tissue for his experts to examine, and alleges that he was assured they would be available, the only physical evidence delivered to him was a small piece of bone, represented as evidence of the fracture in the middle of the victim’s forehead, and portions of the liver, spleen, testes and other organs unrelated to any head injury. They had been preserved in an empty coffee can. On cross-examination the prosecutor used the insufficiency of this evidence to elicit admissions from defendant’s experts that the basis for their opinions was weaker than the opinions of the two pathologists who had observed the skull during the autopsy and swore that it was fractured.
 

 After the judgment of conviction was affirmed by the Appellate Division, defendant obtained an order to exhume the infant’s body and discovered that the skull had not been preserved for examination but had been buried along with the infant’s remains. From an examination of it, witnessed by the People’s forensic experts and representatives of the District Attorney’s office, the defense medical experts determined that
 
 *128
 
 the infant had not sustained a fracture to the front of his skull. The People do not rebut that finding in their motion papers. Defendant further alleges without contradiction that it was apparent to all the experts examining the skull that the piece of bone originally turned over to the defense experts as evidence of the frontal fracture, actually came from the side of the skull. When advised of this, one of the People’s pathologists produced another bone, never before shown to defendant’s experts, asserting it was part of the infant’s skull. None of the experts, however, could relate it to the small bone previously examined or to the infant’s exhumed skull.
 

 Based upon these observations of the infant’s skull, defendant moved to vacate the judgment and for a new trial on the grounds of (1) misconduct by the District Attorney, (2) newly discovered evidence and (3) the violation of his constitutional rights, i.e., failure to preserve and deliver
 
 Brady
 
 material (see, CPL 440.10 [1] [b], [g], [h]). County Court denied the motion without a hearing and the Appellate Division affirmed (210 AD2d 816).
 

 A motion to vacate a judgment based upon a claim of newly discovered evidence is addressed to the discretion of the lower courts (see,
 
 People v Brown,
 
 56 NY2d 242, 246;
 
 People v Crimmins,
 
 38 NY2d 407, 409). Moreover, we agree with the courts below that the allegations of misconduct, other than those relating to the delivery of the skull and brain tissue, are conclusory and do not warrant a hearing (see,
 
 People v Brown, supra).
 
 However, we conclude that a hearing should be held to determine whether the District Attorney misrepresented to defense counsel that the skull and brain tissue had been preserved and that they would be available for examination by his experts before trial, whether the skull constituted
 
 Brady
 
 material and, if it did, whether a new trial is required.
 

 A defendant has a right, guaranteed by the Due Process Clauses of the Federal and State Constitutions, to discover favorable evidence in the People’s possession which is material to either guilt or punishment
 
 (Brady v Maryland,
 
 373 US 83, 87;
 
 People v Vilardi,
 
 76 NY2d 67, 73). Under the New York rule, if a general demand has been made, evidence will be deemed material if there is a reasonable probability that had it been disclosed to the defense, the result would have been different — i.e., a probability sufficient to undermine the court’s confidence in the outcome of the trial
 
 (People v Vilardi, supra,
 
 at 77;
 
 see also, United States v Bagley,
 
 473 US 667; Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book
 
 *129
 
 11A, CPL 440.10, at 429-430). The rule applies regardless of the good or bad faith of the prosecutor, for its purpose is not to punish misconduct but to insure that the accused receives a fair trial
 
 (Brady v Maryland, supra,
 
 at 87;
 
 see also, People v Ahmed,
 
 20 NY2d 958, 960;
 
 People v Savvides,
 
 1 NY2d 554, 557).
 

 In the case before us, the People maintain that the brain tissue and skull were not
 
 Brady
 
 material but that in any event they were not responsible for the delivery of such evidence because it was not in their possession or control
 
 (see, People v Washington,
 
 86 NY2d 189). The thrust of defendant’s argument, however, is that the prosecutor, in violation of his statutory duty to facilitate the discovery of exculpatory evidence (CPL 240.20 [1] [h]; [2]), prejudiced defendant’s ability to obtain the evidence before trial by misrepresenting that it had been preserved and would be available to him.
 

 In support of this claim, defense counsel alleges that he not only made a general demand for
 
 Brady
 
 material in his omnibus motion, but that he also made several informal requests to examine the skull and brain tissue (the first such request was made while the Grand Jury was still considering the case), and that the prosecutor consistently represented to him that the evidence had been preserved and would be made available to him at the proper time. Two weeks before trial, however, the prosecutor delivered only one small piece of bone, claiming it evidenced the fracture of the frontal bone, and no brain tissue or relevant body organs.
 

 Defense counsel contends that the evidence requested was exculpatory because the postexhumation examination established that the People’s experts were in error when they claimed defendant was responsible for inflicting a massive fracture of the frontal bones. He contends further that the evidence was material because the prosecution emphasized the frontal fracture to discredit defendant’s claim of accident, that the jury relied upon it, as evidenced by their inquiries during deliberations, and that the court explicitly referred to the fracture when it imposed the maximum sentence of imprisonment.
 

 The People deny that they represented the skull and brain tissue had been preserved or that they promised to deliver any body specimens other than those produced before trial. Moreover, they assert that there was abundant evidence of guilt, any error in diagnosing the fracture notwithstanding, from the
 
 *130
 
 testimony of the several witnesses and the exhibits received at trial. They note that defense counsel had a full opportunity to examine all these exhibits before trial and that any evidence obtained in the exhumation, even if it fails to show a fracture, is merely cumulative of defendant’s experts’ original trial testimony and relevant only to impeach the credibility of the People’s experts. The People rely on a finding by the Appellate Division on the direct appeal
 
 (see, People v Bryce,
 
 174 AD2d 945) that defendant was not prejudiced by the failure to produce the skull and brain tissue and maintain that defendant’s inability to obtain the evidence was caused by his own delay.
 

 Whether other, sufficient evidence of guilt was produced in response to defendant’s discovery demand is irrelevant if the skull was
 
 Brady
 
 material and representations were made that it had been preserved, when it had not, and was available for trial, when it was not. Nor is the prior Appellate Division ruling conclusive. At the time of the direct appeal defendant’s arguments were necessarily restricted to the failure to deliver discoverable materials and the prejudice that accrued to him as a result. Notably, in rejecting defendant’s claim of prejudice at that time, the Appellate Division stated that defendant had made no claim the evidence was exculpatory (174 AD2d, at 947,
 
 supra).
 
 Indeed, defendant could not have made such a claim before seeing the skull. Thus, the Court’s determination on the direct appeal addressed an entirely different issue than now before us
 
 (see generally,
 
 Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11A, CPL 240.10, at 216). Finally, whether there is any causal relation between the People’s actions and defendant’s ability to obtain exhumation earlier is a matter for the hearing court
 
 (cf., People v Brown,
 
 67 NY2d 555).
 

 Accordingly, the order of the Appellate Division should be reversed and matter remitted to County Court for further proceedings in accordance with this opinion.
 

 Chief Judge Kaye and Judges Titone, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order reversed, etc.