■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BLAINE BRYCE, Appellant. [731 NYS2d 263] —Spain, J. Appeal, by permission, from an order of the County Court of Albany County (Rosen, J.), entered February 14, 2000, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment convicting him of the crime of murder in the second degree, after a hearing.

Defendant stands convicted of murder in the second degree in violation of Penal Law § 125.25 (2) for the January 1988 death of his seven-week-old infant son under an indictment charging him with causing the infant's death "by means of shaking him and inflicting trauma to his head, under circumstances evincing a depraved indifference to human life demonstrated by the multiple injuries to the head, eyes, brain and spine." The bill of particulars repeated that defendant "inflicted trauma" to the infant. At trial, the People presented extensive medical testimony that the infant died as a result of a massive brain hemorrhage due to a fractured skull, whereas defendant presented expert medical testimony supporting his claim of ac-

cidental injury. While several of the prosecution's key testifying medical experts had examined the infant's actual skull and brain prior to his burial, the defense's medical experts—for reasons to be explained—did not, prior to testifying at trial, examine the actual skull and brain and instead relied on X rays, CT scans and other documents and reports. Defendant's conviction was affirmed on direct appeal (174 AD2d 945, *lv denied* 79 NY2d 854).

This appeal, by permission, comes to our Court in the posture of County Court's denial, following a rehearing, of defendant's CPL 440.10 motion to set aside the verdict. This motion was based upon, *inter alia*, conclusions by defense experts—following a 1991 posttrial exhumation of the infant's body—that the medical testimony at trial was erroneous in material respects because, in their opinion, the infant's skull contained no fracture. The focus of the CPL 440.10 hearing conducted by County Court, as directed by the Court of Appeals (88 NY2d 124), was defense counsel's claim that he justifiably relied on the People's alleged pretrial representations that these critical body parts had been retained for later examination by defendant's experts, thus effectively depriving defendant and his medical experts of access to this exculpatory physical evidence prior to trial. The 1991 exhumation established that the skull had in fact been buried with the infant in 1988 shortly after his death. Because we conclude that, on the record as a whole and under the unusual circumstances of this case, justice would be served by the exercise of this Court's discretion to reverse this conviction in the interest of justice (*see, People v Turriago*, 90 NY2d 77, 84; *People v Robinson*, 36 NY2d 224, 228-229, *amended* 37 NY2d 784; *People v Kelly*, 12 NY2d 248; *People v Wright*, 215 AD2d 299), the judgment of conviction should be vacated and a new trial ordered (CPL 470.15 [1], [3] [c]).

An overview of the developments in this case is necessary to understand the basis for our determination to set aside the verdict. At trial, Jack Davies and Jeffrey Hubbard, the two Coroner's pathologists who performed the January 9, 1988 autopsy and examined the infant's skull, testified that the infant sustained a frontal skull fracture (described as running from the bridge of the nose to the anterior fontanelle) as well as intracranial eye and spinal hemorrhaging and extreme brain swelling. Several other prosecution medical experts—who had either treated the infant or were retained to testify and review the X rays, CT scans, autopsy pictures and reports—also testified that there was a fracture to the front of the skull. The

death certificate likewise assigned the cause of death to a massive brain hemorrhage due to a fractured skull. The People's medical experts testified at trial that this alleged skull-splitting fracture and other injuries could not have resulted from an accidental fall as reported by defendant but, rather, required excessive multiple impact blows to the infant's head—described as equivalent to a high-speed automobile accident or a fall from a second story—which were aggravated by violent shaking. The People focused on the purported severe frontal skull fracture in nearly every phase of the trial.

Defendant testified at trial that the infant had accidentally fallen out of his arms to the floor and sometime later appeared to be choking, to which he responded with panic, shaking the infant. At trial, defendant called two medical experts, Cyril Wecht and Bennett Derby, who had examined the X rays, CT scans and autopsy reports as well as defendant's exhibit LL at trial, a bone fragment produced by the People for examination by defendant's experts prior to trial. In sharp contrast to the prosecution's medical experts, these experts testified that they found no evidence of a fracture or multiple impacts and that the injuries were consistent with an accidental fall. Critically, defendant's experts did not examine the infant's actual skull prior to testifying at trial because, when defense counsel requested it for examination by defense experts on the eve of trial, the People were only able to produce exhibit LL and other nonrelevant physical evidence. Significantly, the experts produced by both sides at trial sharply disputed whether the separation of the two bones at the front of the infant's skull (depicted in the X rays, CT scan, autopsy photos and examination) was a fracture caused by extreme force—as the People's experts all testified—or simply a metopic suture (representing the space or seam between the bones which make up the skull), which had expanded due to excessive brain swelling attributable to a fall, as defendant's experts testified.

When the issue arose at trial regarding the whereabouts of the infant's skull and brain to enable examination by the defense experts, the Assistant District Attorney (hereinafter ADA) in charge of the prosecution maintained that he did not know whether the Coroner's office had turned over all of the infant's body parts to the family for burial, although he believed that they had done so. The defense introduced into evidence the sole bone fragment, exhibit LL, through defense expert Derby who identified it as being from the infant's forehead. Derby testified that the bone fragment evinced the metopic suture but did not contain a fracture. In rebuttal for

the People, neuropathologist Douglas Miller also testified that exhibit LL was from the forehead region, but he opined that it did contain a fracture. Defense experts later concluded, upon exhumation, that exhibit LL did not originate from the front of the infant's skull, a conclusion the People did not dispute on this motion. Defendant unsuccessfully moved at trial to dismiss the indictment pursuant to CPL 240.20 focusing on the ADA's failure to preserve the skull and brain tissue.

On direct appeal, this Court affirmed the conviction and maximum 25-year to life prison sentence, essentially declining to disturb the jury's resolution of the conflicting medical opinions presented at trial (174 AD2d 945, *supra*). We held that defendant's general discovery demand did not require the People to preserve and make available the entire skull and brain which defendant had not, then, shown was exculpatory (*id.*, at 947).

When defendant subsequently had the infant's body exhumed, however, it was discovered that the skull was essentially intact, missing only the small bone fragment, exhibit LL. Defendant's medical experts examined the skull and concluded that exhibit LL, in fact, fit into the temple region (anatomical left frontal bone) of the skull and *not* the *forehead region* of the skull, as testified to at trial by experts on *both* sides. Defendant then moved pursuant to CPL 440.10 to vacate the judgment of conviction. Critically, defendant submitted, *inter alia*, the uncontroverted affidavits of the two Board-certified forensic pathologists who had testified on his behalf at trial, each concluding that an examination of the infant's *exhumed* skull revealed absolutely *no fracture*—in the front of the skull or otherwise—only an anatomical metopic/frontal suture line connecting the bones comprising the skull (running from the fontanelle down the forehead to the nasal bone). They also reaffirmed Derby's trial testimony that exhibit LL contained no fracture. To summarize, they specifically concluded—based on their examination of the infant's actual *exhumed* skull—that exhibit LL was not from the infant's forehead region, the infant's frontal skull contained *no fracture* whatsoever, the injuries were consistent with an accidental fall, and the testimony and evidence of a skull fracture produced at trial was grossly erroneous.

Defendant also submitted the affidavit of neuropathologist Richard Defendini, an expert previously uninvolved with this case, who examined all of the evidence and the infant's exhumed skull and likewise concluded that there was no fracture in the skull or in exhibit LL. Significantly, defendant's

medical experts also affirmed that *none of the doctors* in attendance at the posttrial examination of the infant's exhumed skull—which included the People's medical experts, Hubbard and Davies—disputed that the infant's skull contained *no fracture.*

Defendant's trial counsel also emphasized in an affidavit in support of the CPL article 440 motion that, *inter alia,* up until the trial, he believed that the key physical evidence, including the skull and brain, had been preserved and would be made available to defense experts upon request, but when defendant was financially able to retain national medical experts and bring them to Albany County for trial and requested the production of this evidence, the ADA was unable to produce it. As a result, defendant's experts did not, prior to testifying at trial, examine this key evidence which was in fact buried with the infant. Without determining the source of or responsibility for the misunderstanding regarding the availability and location of the infant's skull, we note that early on—as part of the discovery process—the ADA turned over to defense counsel an official report of a noted pathologist who had examined the infant's remains for the People following the autopsy. This report lends support to defense counsel's misapprehension that the infant's skull and brain had not been buried with the infant on January 15, 1988 but, rather, that this critical evidence had been retained and would be available for future examination by other medical experts.*

In opposition to the CPL article 440 motion, the ADA submitted an affidavit contending, *inter alia,* that the medical expert affidavits submitted by defendant in support of the motion constituted, at most, impeachment material as they repeated the testimony of the defense witnesses at trial, i.e., that there was no skull fracture and the injuries were consistent with an accidental fall. Of critical importance, while the burden was, of course, on defendant on the motion to vacate (*see,* CPL 440.30 [6]), the People failed to submit a single affidavit from any medical expert who, after examining the *exhumed* skull and exhibit LL, held or adhered to the view that there was a skull fracture or a frontal skull fracture, relying instead on the extensive trial testimony of their medical experts.

County Court (Breslin, J.) denied the motion to vacate without a hearing and this Court affirmed (210 AD2d 816). On

---

* In our view, the testimony of defendant's trial counsel at the CPL article 440 hearing indicates that he was misled by the pathologist's report and, in fact, relied upon it in making only a general discovery demand and in conducting his planning of the defense.

appeal, the Court of Appeals reversed, determining that defendant was entitled to a hearing on his allegation that the People prejudiced his ability to obtain the infant's skull and brain—potentially *Brady* material—before trial by misrepresenting that it had been preserved and would be available to him and his experts (88 NY2d 124, 128-129, *supra*).

After a rehearing directed by this Court (246 AD2d 75, *appeal dismissed* 92 NY2d 1024), County Court (Rosen, J.) denied defendant's motion to vacate the judgment of conviction and we defer without reservation to County Court's finding that the ADA made no express misrepresentations. Regardless of where the ultimate responsibility lies, however, we find, on these particular facts, that the fact that the defense medical experts did not examine the infant's skull prior to testifying at trial fundamentally affected the reliability of the verdict. Indeed, on a prior appeal involving this very CPL 440.10 motion, this Court openly recognized that the failure of the defense experts to timely examine this critical evidence prevented timely disclosure of "a serious flaw" in the prosecution's case (246 AD2d 75, 78-79, *supra*). A reading of the trial transcript as a whole reveals, unquestionably, that the existence of a severe or any fracture in the infant's skull and the nature of the impacts and force that caused the fractures and head injuries became significant issues at this trial. Importantly, the testimony and opinions of the defense experts were substantially undermined based upon their not having examined the infant's actual skull prior to testifying, which was overtly contrasted to the prosecution's medical experts who had examined the actual skull and reached a directly conflicting medical conclusion.

In view of the foregoing, we find that defendant's documentary evidence in support of this motion establishes that the verdict contained an infirmity in that it was based upon potentially flawed but critical medical testimony. The People's sole reliance upon the trial testimony in opposing this motion, under the unique circumstances herein presented, is inadequate. Significantly, the People failed to submit an affidavit refuting the critical aspects of the defense experts' averments (*see, People v Van Wie*, 238 AD2d 876, *lv denied* 94 NY2d 926).

We have reviewed and are mindful of the extensive trial testimony establishing the infant's considerable injuries aside from the purported skull fracture but, in the exercise of discretion, find the conclusion to be inescapable on these incomparable facts that, in the interest of justice, defendant is entitled to a new trial (*see*, CPL 440.10 [3] [last paragraph]; 470.15 [1],

■ [c]; 470.25 [2] [a]). While granting defendant's motion to vacate the judgment of conviction and granting him a new trial, we emphasize that we are not resolving the conflict in medical opinions, if any persists, regarding the nature of the infant's injuries or otherwise. In light of the foregoing, we need not reach any of defendant's remaining claims.

Cardona, P. J., Peters and Carpinello, JJ., concur.

Crew III, J. (concurring). I concur in the result reached by my colleagues but feel compelled to write separately because my reasons are so disparate. Like the majority, I believe that this is a case where we should invoke our "interest of justice" jurisdiction. However, the majority does so without finding any trial error on the part of the People, defense counsel, the trial court or the jury, a concept that I find troubling. Thus, while I agree that defendant indeed is entitled to a new trial, I would grant such relief based upon an identifiable trial error— namely, the ineffective assistance of counsel, notwithstanding the fact that such error was not raised on defendant's CPL article 440 motion (cf., People v Wilson, 252 AD2d 241, 248).

I start with the fact that defense counsel made a general pretrial demand for *Brady* material without specifically requesting discovery of the infant's skull. Additionally, the trial court's determination following the CPL article 440 hearing, that defendant failed to prove that the People misrepresented that they had preserved and would deliver to defense counsel the victim's skull for discovery and inspection, compels the conclusion that defense counsel did not orally request such discovery. Such conclusion is fortified by the fact that defense counsel moved for a trial order of dismissal based upon the People's failure to produce the victim's skull, but made no claim that the People had made assurances that such had been preserved for defense experts' inspection. Indeed, at the time of that motion, in response to the trial court's inquiry, defense counsel stated that he first inquired about inspecting the skull one week before trial. I conclude that the failure of defense counsel to timely request and secure the production of what plainly was critical evidence for examination by defense experts (and what later turned out to be *exculpatory* material) constituted ineffective assistance of counsel and, hence, deprived defendant of a fair trial.* I would thus reverse and order a new trial on that basis. Ordered that the order is reversed, on the

---

* The majority's unwillingness to determine the source of or responsibility for, as they characterize it, the misunderstanding regarding the availability and location of the infant's skull is my principal concern. While the majority suggests that such misunderstanding may have arisen by reason of the

facts and as a matter of discretion in the interest of justice, and matter remitted to the County Court of Albany County for further proceedings not inconsistent with this Court's decision.

contents of a pathologist's report, this is contrary to defense counsel's testimony at the hearing that he relied upon the People's representations in response to his request, that the skull would be preserved and retained for examination by defendant's experts, not that he was misled by an expert's report.