People v Spruill (2018 NY Slip Op 06041)





People v Spruill


2018 NY Slip Op 06041


Decided on September 12, 2018


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on September 12, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

JOHN M. LEVENTHAL, J.P.
SHERI S. ROMAN
FRANCESCA E. CONNOLLY
LINDA CHRISTOPHER, JJ.


2017-04490
 (Ind. No. 13008/95)

[*1]The People of the State of New York, appellant, 
v
Tasker Spruill, respondent.


Eric Gonzalez, District Attorney, Brooklyn, NY (Leonard Joblove, Victor Barall, and Morgan J. Dennehy of counsel), for appellant.
Rita Dave, Brooklyn, NY, for respondent.



DECISION & ORDER
Appeal by the People from an order of the Supreme Court, Kings County (Michael Gerstein, J.), entered March 27, 2017, which, after a hearing, granted those branches of the defendant's motion which were pursuant to CPL 440.10(1)(b), (f), and (h) to vacate a judgment of the same court (Ariel E. Belen, J.) rendered September 16, 1998, convicting him of murder in the second degree, upon a jury verdict, and imposing sentence.
ORDERED that the order is reversed, on the law, and those branches of the defendant's motion which were pursuant to CPL 440.10(1)(b), (f), and (h) to vacate the judgment rendered September 16, 1998, are denied, the judgment is reinstated, and the matter is remitted to the Supreme Court, Kings County, which, upon at least two days' notice to the defendant and his attorney, shall promptly direct the defendant to surrender himself to the court in order that execution of the judgment may resume.
The defendant was charged with murder in the second degree, among other crimes, in connection with the shooting death of Tracey Thomas on October 22, 1993. Thomas was shot and killed as he sat in his car outside a game room operated by the defendant, who was known as "Pike."
The evidence at trial, which was conducted in 1998, included the testimony of two eyewitnesses who identified the defendant as the shooter. One eyewitness to the shooting, Marilyn Connor, testified that she heard a gunshot and saw a spark coming from the defendant, who was standing in front of Thomas. Connor stated that she had seen the defendant "[o]nce or twice" before. The other eyewitness, Shawn Newton, testified that the defendant exited the game room, approached Thomas's car, and shot Thomas in the chest. Newton stated that he had known the defendant "all [his] life." Newton was incarcerated at the time of trial on charges unrelated to those against the defendant. He also testified regarding an implied threat that was made to him by a fellow inmate concerning Newton's testimony in this case. Several police officers testified concerning the efforts that were made to locate the defendant following the shooting, and that the police were unable to find him until August 1997, when he was apprehended in Baltimore. After he was apprehended, the defendant told a detective assigned to the fugitive task force that his name was Kevin Michael Mulberry. The People and the defendant also entered into a stipulation at trial that the defendant "at one time had a small tattoo on . . . his left arm," which said "Pike." At the time of trial, however, [*2]the tattoo, which was shown to the jury, depicted a panther.
At the conclusion of the trial, the jury convicted the defendant of murder in the second degree. The judgment of conviction was affirmed on direct appeal by decision and order of this Court dated November 4, 2002 (see People v Spruill, 299 AD2d 374).
In March 2016, the defendant moved to vacate the judgment, inter alia, pursuant to CPL 440.10(1)(b) on the ground that the judgment was procured by duress, misrepresentation, or fraud on the part of the prosecutor, and pursuant to CPL 440.10(1)(f) and (h) on the ground that the prosecution violated its duty to disclose certain material favorable to the defense. Specifically, the defendant argued that the prosecution had violated Brady v Maryland (373 US 83) by failing to disclose certain pretrial orders pursuant to which Newton was produced from prison to meet with the prosecutor to discuss his testimony. The defendant argued that these "Damiani orders" (see generally People v Jackson, 65 NY2d 265, 267 n 1), were explicitly contingent on Newton providing his written consent to being taken into temporary custody by detective investigators representing the District Attorney's Office; however, Newton's signature was absent from the consent sections of those orders. Additionally, the defendant argued, among other things, that the prosecutor had "abused a secret material witness" order to obtain Connor's testimony, and that Newton's testimony at trial was coerced.
The Supreme Court directed that a hearing be held on the defendant's motion with respect to the issues of whether Newton had consented to meet with the prosecutor approximately 20 times prior to trial, as Newton had testified at trial, or whether his testimony was coerced, and whether the prosecutor engaged in a deliberate pattern of deception upon the court. At the hearing, testimony was elicited from, among other witnesses, the Assistant District Attorney who prosecuted the case against the defendant (hereinafter the prosecutor). The record indicates that due to an apparent medical condition, Newton was not called as a witness at the hearing, which commenced in August 2016.
Following the hearing, the Supreme Court determined, among other things, that the People had committed a Brady violation by failing to disclose the Damiani orders that the prosecutor had used to secure Newton's presence, one of which contained the notation "refused," as well as evidence that Newton had refused to be produced to meet with the prosecutor. Additionally, the court found that the People had violated Brady by failing to disclose a record from the Department of Corrections and Community Supervision (hereinafter DOCCS) evidencing that Newton had attempted suicide in his cell at or around the time period that he was supposed to be produced to meet with the prosecutor. The court determined that Newton's lack of written consent to the meetings with the prosecutor constituted material which could have been used to further impeach Newton, and that Newton's suicide attempt, explicit refusal to be produced, and lack of written consent to production could have supported the defense argument that Newton's testimony was coerced and not credible. The court also determined that the prosecutor had improperly failed to disclose that he had obtained a material witness order to secure Connor's testimony. While the court concluded that application of the "reasonable possibility" standard was appropriate in evaluating the subject Brady violations, the court found that it was both "reasonably probable" and "reasonably possible" that the undisclosed items would have changed the outcome of the proceedings.
The Supreme Court further determined that the prosecutor had engaged in prosecutorial misconduct by failing to correct Newton's testimony concerning the number of times that he had met with the prosecutor prior to trial, and by referring to that testimony during his summation. The court also determined that the defendant was entitled to relief pursuant to CPL 440.10(1)(b) inasmuch as "there was evidence that Newton was subject to duress by being repeatedly produced to meet with [the prosecutor] after his suicide attempt and refusals [to be produced]." Accordingly, the court granted those branches of the defendant's motion which were pursuant to CPL 440.10(1)(b), (f), and (h) to vacate the judgment, and directed a new trial. The People appeal.
A defendant has a right, guaranteed by the Due Process Clauses of the federal and state constitutions, to discover favorable evidence, known as Brady material, in the People's [*3]possession which is material to either guilt or punishment (see Brady v Maryland, 373 US at 87; People v Bryce, 88 NY2d 124, 128; People v Wagstaffe, 120 AD3d 1361, 1363). "The prosecutor's duty to exchange Brady material extends to the disclosure of evidence that can be used to impeach the credibility of a witness for the People whose testimony may be determinative of the defendant's guilt" (People v Wagstaffe, 120 AD3d at 1363; see Giglio v United States, 405 US 150, 154-155; People v Baxley, 84 NY2d 208, 213).
"To establish a Brady violation, a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (People v Fuentes, 12 NY3d 259, 263; see People v Salton, 74 AD3d 997, 999). "In New York, where a defendant makes a specific request for a document, the materiality element is established provided there exists a reasonable possibility' that it would have changed the result of the proceedings" (People v Fuentes, 12 NY3d at 263, quoting People v Vilardi, 76 NY2d 67, 77). "Absent a specific request by defendant for the document, materiality can only be demonstrated by a showing that there is a reasonable probability' that it would have changed the outcome of the proceedings" (People v Fuentes, 12 NY3d at 263, quoting People v Bryce, 88 NY2d at 128; see People v Vilardi, 76 NY2d at 73; People v Salton, 74 AD3d at 998-999; People v Bryant, 247 AD2d 400, 401). "The mere possibility that undisclosed evidence, which was not requested, might have helped the defense or affected the outcome of the trial does not establish materiality in the constitutional sense" (People v Figueroa, 213 AD2d 669, 669-670; see People v Salton, 74 AD3d at 999; People v Alongi, 131 AD2d 767, 768).
Here, the Supreme Court should have denied that branch of the defendant's motion which was to vacate the judgment of conviction on the ground that the prosecution committed Brady violations. The nondisclosure of the DOCCS record reflecting Newton's apparent suicide attempt did not constitute a Brady violation, inasmuch as the information contained in that record was not favorable to the defense. As set forth in the DOCCS record, Newton, who was observed in the process of tying a bed sheet around a radiator pipe, reported that he was "stressed and [did] not want to go to court in fear of [the] safety of himself and family," and that he "fears [the defendant]." The DOCCS record further indicated that Newton was "[a]ssured that this [would] be noted and that there should be no contact between him and enemy as well as enemy's family." Thus, the DOCCS record attributed the apparent suicide attempt to Newton's fear of the defendant and was therefore not favorable to the defense.
In any event, the DOCCS record was not within the control of the prosecutor, who testified at the CPL article 440 hearing that he was not aware that Newton had attempted to commit suicide. Rather, the record was in the possession of DOCCS, which is "in most respects, an administrative rather than a law enforcement agency" (People v Howard, 87 NY2d 940, 941; see People v Lanfranco, 124 AD3d 1144, 1145). Thus, the record is not imputable to the People, and the prosecutor had no obligation to locate and produce the record to the defense (see People v Howard, 87 NY2d at 941; People v Lanfranco, 124 AD3d at 1145-1146; People v Smith, 89 AD3d 1148, 1150).
Furthermore, that the prosecutor had obtained a material witness order to secure Connor's testimony did not constitute Brady material because that information was not exculpatory (see People v Lundy, 48 AD3d 1046, 1047). To the contrary, the record indicates that Connor's absence was due to her fear of testifying against the defendant. During the trial, the prosecutor had informed the court, among other things, that one day after the shooting, an individual told Connor's sister that Connor would be killed if she returned to the area. In any event, the defendant was not prejudiced by the failure of the prosecutor to disclose that he had obtained a material witness order for Connor, as the jury was aware that Connor did not want to testify. At trial, Connor testified that she "didn't want to be here. The detectives had to threaten me to bring me here. I didn't want to come."
We next turn to the nondisclosure of the Damiani orders, which are orders of the Supreme Court, Kings County, pursuant to which custody of an inmate, with the inmate's consent, [*4]is delivered to the police department to be interviewed by the District Attorney's Office (see People v Jackson, 65 NY2d at 267 n 1). The defendant did not make a specific request for the production of such orders. Therefore, the orders would be material only if there is a reasonable probability that, had they been disclosed, the outcome of the proceedings would have been different (see People v Fuentes, 12 NY3d at 263; People v Wagstaffe, 120 AD3d at 1364). However, contrary to the Supreme Court's determination, the orders did not satisfy the materiality standard. That Newton did not sign the consent portions of the orders did not establish that he was brought to the District Attorney's Office to meet with the prosecutor without his consent, or that his testimony was coerced. At the CPL 440 hearing, the prosecutor testified that Newton never told him that he did not want to meet, nor did Newton direct the prosecutor to stop bringing him to court. Moreover, a New York City Correction Officer, who worked as a court productions staff member at Rikers Island, testified at the hearing that if an inmate refused to go to court or to be taken by an outside agency, the inmate could not be forced to leave the facility unless the court issued a force order. The prosecutor testified that he did not attempt to obtain a force order to compel Newton to appear in court.
Furthermore, the evidence of the defendant's guilt was strong (see Spruill v Phillips, 2005 WL 1743828, *6, 2005 US Dist LEXIS 14869, *17-18 [ED NY, No. 04 CV 1382(NG)(MDG)]). The defendant was identified as the shooter by two eyewitnesses who were familiar with the defendant. Additionally, the shooting occurred on the street outside the defendant's game room. There was also substantial evidence demonstrating the defendant's consciousness of guilt. The police witnesses testified concerning their extensive efforts to locate the defendant after the shooting, and that they were unable to locate him until approximately four years later when he was apprehended in Baltimore. At that time, the defendant provided the detective with a false name. Further, Newton testified about an implied threat he received from a fellow inmate concerning his testimony in this case, and there was evidence that the defendant, who was known as Pike, once had a Pike tattoo on his arm that had been altered by the time of trial. Given the strong evidence of the defendant's guilt, there is no reasonable probability that the disclosure of the Damiani orders and the fact that one of those orders indicated that Newton had refused to be produced would have affected the outcome of the trial (see People v Moore, 43 AD3d 1085, 1086; People v Figueroa, 213 AD2d at 670).
The Supreme Court also should have denied that branch of the defendant's motion which was to vacate the judgment pursuant to CPL 440.10(1)(b). Initially, contrary to the defendant's contention, the People did not abandon their challenge to the court's determination that Newton was subject to duress by the prosecutor. Turning to the merits, pursuant to CPL 440.10(1)(b), a judgment may be vacated upon the ground that it "was procured by duress, misrepresentation or fraud on the part of the court or a prosecutor or a person acting for or in behalf of a court or a prosecutor." Here, the defendant failed to show that Newton's testimony was the product of duress based on his postsuicide attempt productions to meet with the prosecutor.
At the hearing, the prosecutor testified that he did not threaten Newton or tell Newton that he was required to testify. Additionally, as noted above, the prosecutor testified that Newton never said that he did not want to meet with the prosecutor, nor did Newton tell the prosecutor to stop bringing him to court. While Newton was reluctant to testify at the defendant's trial, the prosecutor's hearing testimony revealed that Newton told the prosecutor that he was aware that a third eyewitness to the shooting, his friend Greg Pearson, had been shot and killed in 1994 prior to the defendant's trial in 1998. The prosecutor explained that Newton's reluctance to testify against the defendant was out of concern for the safety of himself and his wife. The Assistant District Attorney who served as coprosecutor on the defendant's case also testified at the hearing that Newton was reluctant to testify because he was afraid of the defendant and the defendant's family and friends, who Newton "felt would cause harm to his family."
The record also reflects that Newton requested and was to receive significant benefits in exchange for his testimony against the defendant. Those benefits included the prosecutor writing a letter to the parole board on Newton's behalf in support of his release, assisting Newton in seeking a transfer to a different correctional facility, and ensuring that he was not placed in punitive segregation. The promises that were made to Newton were set forth on the record before the jury [*5]during his direct testimony at trial, and were explored by defense counsel during cross-examination so as to enable the jury to assess the witness's credibility. Notably, when the defendant's trial counsel cross-examined Newton about the promises that had been made to him in exchange for testifying against the defendant, Newton twice confirmed, "I'm here because I want to be here." Thus, the defendant failed to establish that Newton's testimony was procured by duress on the part of the prosecutor.
Lastly, vacatur of the judgment was not warranted based on the prosecutor's failure to correct Newton's trial testimony that he had met with the prosecutor approximately 20 times prior to trial, and the prosecutor's reference to such testimony during summation. Prosecutors, in their role as public officers, are required to correct the knowingly false or mistaken material testimony of a prosecution witness (see People v Colon, 13 NY3d 343, 349; People v Steadman, 82 NY2d 1, 7). "Where a prosecutor elicits or fails to correct such inaccurate testimony, reversal and a new trial are necessary unless there is no reasonable possibility' that the error contributed to the conviction" (People v Colon, 13 NY3d at 349, quoting People v Pressley, 91 NY2d 825, 827). In the present case, the prosecutor testified at the CPL 440 hearing that he had met with Newton "maybe seven or eight times," not 20 times as Newton testified at trial. However, while the prosecutor should have corrected Newton's testimony and should not have referenced such testimony during summation, the subject testimony was not material. In any event, there is no reasonable possibility that the failure to correct Newton's inaccurate testimony concerning the number of times he met with the prosecutor contributed to the defendant's conviction.
Accordingly, those branches of the defendant's motion which were pursuant to CPL 440.10(1)(b), (f), and (h) to vacate the judgment should have been denied.
LEVENTHAL, J.P., ROMAN, CONNOLLY and CHRISTOPHER, JJ., concur.
ENTER:
Aprilanne Agostino
Clerk of the Court