Gordon DAVIS, Petitioner–Appellant,

v.

Charles GREINER, Superintendent, Green Haven Correctional Facility, Respondent–Appellee.

Docket No. 04–4087–PR.

United States Court of Appeals, Second Circuit.

Argued: March 1, 2005.

Decided: Oct. 11, 2005.

Georgia J. Hinde, New York, NY, for Petitioner–Appellant.

Michael J. Miller, Assistant District Attorney (Thomas J. Spota, District Attorney of Suffolk County, on the brief), Riverhead, NY, for Respondent–Appellee.

Before: CALABRESI, CABRANES, and POOLER, Circuit Judges.

POOLER, Circuit Judge.

Petitioner Gordon Davis, currently incarcerated in a New York state prison, appeals from the June 21, 2004 amended judgment of the United States District Court for the Eastern District of New York (Seybert, *J.*), denying his petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, but issuing a certificate of appealability (COA). Davis's habeas petition sought to challenge his New York state conviction on two counts of murder in the second degree, New York Penal Law § 125.25(2)-(3), which was upheld on direct appeal. Davis's habeas challenge is principally based on his argument that he was denied his constitutional right to effective

assistance of counsel, as defined by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because (1) his pre-trial counsel's performance was objectively unreasonable in failing to advise sixteen-year-old Davis, a first-time offender, that any incriminating statements that he made during his proffer sessions with law enforcement could be used as evidence against him if he stood trial rather than following through with the plea agreement and (2) Davis, who later had to stand trial due to his failure to comply with the conditions of his plea, was prejudiced by these errors because he would not have originally agreed to "the proposed proffer and plea"—which included a requirement that he agree to testify against family members—had he been properly informed that his proffer statements could be used against him.

The district court denied Davis's habeas petition, ruling, inter alia, that (1) his counsel's performance did not fall below an objective standard of reasonableness in failing to warn Davis about the consequences of proffering and (2) even if this failure was unreasonable, Davis was not prejudiced by his counsel's unreasonable performance because Davis would have accepted the plea offer, and would have proffered the statements regardless. With respect to the first determination, we disagree with the district court. However, we do not reverse the district court's judgment denying the writ because we affirm the district court's determination that the unreasonable performance of Davis's counsel did not prejudice Davis. Because *Strickland* requires *both* a showing that counsel's performance was unreasonable and that prejudice arose therefrom, we hold that the state court's denial of Davis's ineffective assistance of counsel claim was not "an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Accordingly, we affirm the judgment.

## BACKGROUND

We draw the facts, which are largely undisputed, principally from the district court's Memorandum and Order of June 9, 2004. On or about November 17, 1995, law enforcement officers arrested Davis, Shamel Thomas ("Shamel"), Davis's half-brother, and Sheron Thomas ("Sheron"), Davis's foster sister, for the murder of Frank Olivieri. Sheron had enlisted Davis and Shamel to beat Olivieri, who was Sheron's former fiancé, before she set him on fire. On the night of the murder, Sheron, Davis, Shamel, and Shamel's girlfriend, Nikkita Cumberbatch ("Nikkita"), assembled at Sheron's apartment. Sheron created a mixture of gasoline and lighter fluid and then (1) directed Nikkita to take the getaway car to an inconspicuous location and wait for Davis and Shamel; (2) told Davis and Shamel where to hide in waiting for Olivieri; and (3) phoned Olivieri to request that he come to her apartment immediately and retrieve his cat.

Olivieri complied with Sheron's request and, as soon as Olivieri exited Sheron's apartment building, Shamel struck Olivieri over the head with a baseball bat. While Shamel continued striking Olivieri with the bat, Davis repeatedly kicked him. After the beating, as planned, Shamel and Davis stole Olivieri's wallet and fled to Nikkita's car. Subsequently, Sheron set Olivieri on fire. According to the medical examiner, it was unclear whether the head injuries or the burns ultimately caused Olivieri's death. Davis, Shamel, and Sheron were indicted on three counts of murder in the second degree, *see* N.Y. Penal Law §§ 125.25(1) (intentional murder), 125.25(2) (depraved indifference murder), 125.25(3) (felony murder).

*I. Davis's proffer and guilty plea*

Not long after the arrests, the court appointed William Nash to serve as counsel to Davis, and the Suffolk County District Attorney's Office (the "DA") commenced plea negotiations with Davis and Shamel. The DA informed Nash that Davis could plead guilty to first-degree manslaughter, instead of murder, and might have the chance to be adjudicated as a youthful offender,[1] in exchange for Davis's participation in proffer sessions and Davis's agreement to testify against Sheron and Shamel if necessary. If Davis accepted this proposal, he would have a sentencing exposure that ranged from a minimum sentence of time served[2] to a maximum sentence of eight and one-third to twenty-five years in prison. If Davis rejected this plea offer, he faced a sentencing exposure of twenty-five years to life for each of his three counts of murder in the second degree.

Nash counseled Davis about the benefits of accepting the DA's offer, highlighting that (1) various defenses, including alibi and entrapment, would not be available to Davis if he stood trial and (2) a plea of guilty to manslaughter had the potential to greatly reduce Davis's sentencing exposure. Davis was informed that he might have to testify against Shamel and Sheron at trial but Davis was never told, by Nash or otherwise, that any statement he made during the proffer session could be used against him if the plea agreement did not materialize or if, after pleading guilty, Davis had to stand trial. Even though Nash was aware of Davis's emotional attachments to Sheron and Shamel, Nash did not inform Davis of the consequences of the proffer, nor negotiate with the DA, at any time, regarding a potential non-use clause, which would have conditioned Davis's participation in the proffer session on an agreement that his statements could not be used against him if his case went to trial. Furthermore, there is no evidence in the record that the law enforcement agents who interviewed Davis during the proffer session ever informed Davis that his statements could be used against him at a subsequent trial.

Following Nash's advice, Davis decided to meet with law enforcement officials for a proffer session on March 21, 1996. During the March 21, 1996, proffer session Nash remained outside of the room for most of the time, but entered periodically when Davis requested advice or when the interviewers became frustrated with Davis. During the proffer session, Davis recounted the events leading up to Olivieri's murder. He also signed an affidavit that enabled law enforcement to obtain a search warrant against Sheron. Eight days after the first proffer session, on March 29, 1996, Davis pleaded guilty to first-degree manslaughter, which was accepted by the trial court. Davis was not sentenced at that time because the plea agreement also required that he truthfully testify against Sheron and Shamel if necessary.

*II. Davis's failure to testify adequately against Sheron Thomas*

Pursuant to the plea agreement, the government requested that Davis testify against his foster sister, Sheron Thomas. To prepare for his testimony at Sheron's trial, Davis met with prosecutors on June

---

1. Youthful offender status entitles defendants to certain benefits, including privacy protections. *See* N.Y.Crim. Proc. Law § 720.35(2); *United States v. Driskell*, 277 F.3d 150, 155–56 (2d Cir.2002) (describing benefits).

2. The DA's office estimated that a sentence of "time served" would have amounted to "a few years in prison" for Davis. *Davis v. Greiner*, No. 01–7936(JS), at 4 (E.D.N.Y. June 9, 2004).

4, 1997, and on August 25, 1997. Nash was only present for a portion of the June 4, 1997 meeting. On September 11, 1997, Davis took the stand and testified for forty-five minutes about the various aspects of Sheron's plan to beat and set fire to Olivieri. Davis's testimony, which implicated himself and his co-defendants was consistent with his prior sworn statements.

The following day, Davis told the court, through Nash, that he would not continue testifying against Sheron. The trial court warned Davis that he would lose the benefits of his plea agreement if he failed to testify and adjourned the proceedings for the weekend to allow Davis to confer with Nash. The prosecution informed Davis that he would not need to testify against Shamel, his half brother, because Shamel had recently pleaded guilty to murder in the second degree. Despite warnings from Nash that Davis would likely lose his plea agreement and face trial for murder, Davis decided not to continue testifying against Sheron, and the trial judge declared a mistrial. Davis subsequently explained that Sheron had cried during his testimony and that this had affected his ability to proceed. At this time, Davis was still unaware that his failure to testify would mean that his proffer session statements could be used against him, but he later admitted that he would have still decided not to testify at that point even if Nash had told him about this consequence.

Subsequently, the trial court granted Davis's pro se motion to remove and replace Nash as his assigned counsel but refused Davis's attempts, based on an argument that his counsel was ineffective, to suppress his prior proffer session statements and his forty-five minute testimony at Sheron's trial. The court also rejected Davis's opposition to the government's motion to vacate his manslaughter plea. Davis's manslaughter plea was vacated and Davis's case proceeded to trial.

### III. Davis's trial and state court appeals

At trial, the government entered as principal evidence against Davis, (1) all of Davis's incriminating statements, except those that he made during his plea allocution;[3] (2) testimony from Nikkita, the driver of the getaway car; and (3) testimony from the medical examiner. After both sides rested, the government successfully moved, without objection from Davis, to withdraw the intentional murder count. The remaining two counts, for depraved indifference murder, New York Penal Law § 125.25(2), and for felony murder, New York Penal Law § 125.25(3), were submitted to the jury. During deliberations, the jury requested to have Davis's incriminating statements repeated. On June 30, 1998, the jury unanimously found Davis guilty on both counts of murder in the second degree. On July 29, 1998, Davis received two concurrent sentences of twenty-five years to life.

Davis appealed this ruling to the Appellate Division, Second Department, contending, inter alia, that "Nash was constitutionally ineffective as counsel because (1) he left Davis alone with law enforcement during the three proffer sessions; (2) he failed to inform Davis at anytime, including prior to the initial March 21, 1996 meeting and at Sheron's first trial, that his incriminating statements could later be used against him if his guilty plea was withdrawn; and (3) counsel did not secure the non-use of Davis's pre-plea statements to law enforcement as a condition of the plea agreement." *Davis v. Greiner*, No. 01–7936(JS), at 8 (E.D.N.Y. June 9, 2004).

---

**3.** New York law prohibits the admission of a defendant's withdrawn guilty plea at trial.

*See People v. Spitaleri*, 9 N.Y.2d 168, 212 N.Y.S.2d 53, 173 N.E.2d 35 (1961).

The Appellate Division upheld the admission of Davis's prior statements and summarily determined that Davis "was not deprived of the effective assistance of counsel." *People v. Davis*, 276 A.D.2d 801, 715 N.Y.S.2d 153, 153 (2d Dept. 2000). On January 19, 2001, Judge Wesley, then sitting in the New York Court of Appeals, denied Davis leave to appeal. *People v. Davis*, 96 N.Y.2d 733, 722 N.Y.S.2d 800, 745 N.E.2d 1023 (2001). On November 26, 2001, Davis filed a pro se habeas petition pursuant to 28 U.S.C. § 2254.

### IV. Davis's federal habeas proceedings

The district court appointed counsel to represent Davis in his habeas proceedings. Davis reiterated his ineffective assistance of counsel claim to the federal habeas court, arguing that Nash was ineffective in failing to: (1) remain in the interview room during Davis's proffer sessions; (2) secure a non-use clause as a condition of the plea agreement; and (3) advise him that any incriminating statements made during the proffer sessions could be used against him if he stood trial. On November 25, 2003, the district court held an evidentiary hearing. Nash, Davis, and Assistant District Attorney Peter Timmons, who had served as trial prosecutor, testified at the hearing.

The district court, by Memorandum and Order, determined that Nash's failure to remain in the interview room during the proffer sessions was not objectively unreasonable because Davis did not request that Nash stay in the room and Nash informed Davis that he would be available outside. *Davis*, 01–7936 at 15. With respect to Davis's non-use argument, the district court determined that counsel's failure to secure a non-use clause as a condition of the plea agreement was not sufficient to support a finding of ineffective assistance of counsel. *Davis*, 01–7936 at 21–23. After considering Davis's argument regarding Nash's failure to warn Davis about the risks of the proffer session, the district court determined (1) that Nash's failure to give this advice was not objectively unreasonable and (2) that Nash's failure did not prejudice Davis because he would still have decided to talk to the detectives about his participation in Frank Olivieri's murder even if he had received the advice. *Davis*, 01–7936 at 19–20.

Notwithstanding these conclusions, the district court granted a certificate of appealability ("COA") on the question of whether Nash had an obligation to advise Davis, prior to the March 21, 1996, proffer session, that his proffer session statements could be used against him if he stood trial. We therefore focus on Nash's failure to warn Davis, before he accepted the plea offer, about the risks associated with his participation in the proffer session. We do not review whether Nash was ineffective in failing to accompany Davis during his proffer sessions and in failing to attempt to secure a non-use agreement, as these issues are outside the scope of the COA. *See Smaldone v. Senkowski*, 273 F.3d 133, 139 (2d Cir.2001) (per curiam) (acknowledging that 28 U.S.C. § 2253(c) indicates that this court does not have jurisdiction to consider issues outside the COA). However, these two facts are intertwined with our ineffective assistance inquiry regarding Nash's failure to advise Davis about the risks of proffering because either could have mitigated these risks.[4]

---

4. A non-use agreement would have eliminated the risks associated with proffering entirely. Accompanying Davis into the proffer sessions would at least have allowed Nash to attempt to minimize Davis's self-incriminating statements and could have resulted in Davis being better informed about the potential future use of those statements. Since a non-use agreement was not negotiated and Nash did not accompany Davis into the proffer session, in-

## DISCUSSION

We review the district court's denial of defendant's habeas corpus petition de novo and its factual findings for clear error. *DeBerry v. Portuondo,* 403 F.3d 57, 66 (2d Cir.2005). In a case such as this, where a habeas petition was brought subsequent to the effective date of the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104–132, 110 Stat. 1214, and the state court has adjudicated the claim on the merits, a federal court cannot grant a writ of habeas corpus unless the state court's proceedings (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

■■■ Our main inquiry is whether the state court's denial of Davis's appeal relied on "an unreasonable application of *Strickland,* which is the relevant clearly established federal law" in this case.[5] *Cox v. Donnelly,* 387 F.3d 193, 197 (2d Cir.2004); *see Williams v. Taylor,* 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). It is well settled that a defendant's Sixth Amendment right to counsel extends to plea negotiations. *See, e.g., United States v. Gordon,* 156 F.3d 376, 379 (2d Cir.1998) (per curiam) (stating that defendant's Sixth Amendment right attaches at the initiation of formal charges and extends to

"all critical stages in the proceedings," including plea negotiations). *Strickland*'s test for ineffective assistance of counsel consists of two separate prongs, both of which must be satisfied in order to establish a constitutional violation. A defendant must show both (1) that defense counsel's performance "fell below an objective standard of reasonableness ... under prevailing professional norms" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052.

The certificate of appealability is does not specify whether it incorporates both prongs of *Strickland.* We believe, however, that the COA, properly construed, incorporates both of the *Strickland* prongs. Neither prong in itself can establish the denial of a constitutional right, so that for a COA to properly issue, a substantial showing must have been made on both prongs. *See generally* 28 U.S.C. § 2253(c); *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (finding that a COA should issue when the petitioner demonstrates that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.").

■■■ To determine whether the state court applied this two-prong test in an "objectively unreasonable manner," *see Bell v. Cone,* 535 U.S. 685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), this court

---

forming Davis of the risks of proffering was especially important.

5. The government suggests that, because the Supreme Court has never considered *Strickland* in the context of facts similar to this case, there is no clearly established law to apply in this case. This argument is foreclosed by our decision in *Aparicio v. Artuz,* 269 F.3d

78, 95 n. 8 (2d Cir.2001) ("It is beyond cavil that the *Strickland* standard qualifies as 'clearly established Federal law.' ... For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.' ") (internal citation omitted).

must find that there was "[s]ome increment of incorrectness beyond error" but "the increment need not be great." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000). Furthermore, because the state courts "summarily rejected" Davis's ineffective assistance claim on the merits, "we must focus on the ultimate decisions of those courts, rather than on the courts' reasoning." *Aeid v. Bennett*, 296 F.3d 58, 62 (2d Cir.2002); *Sellan v. Kuhlman*, 261 F.3d 303, 311–12 (2d Cir.2001) ("[W]hen a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent.").

## I.  Strickland's *First Prong*

■ When assessing whether or not counsel's performance "fell below an objective standard of reasonableness … under prevailing professional norms," *Strickland* directs us to consider the circumstances counsel faced at the time of the relevant conduct and to evaluate the conduct from counsel's point of view. 466 U.S. at 688–89, 104 S.Ct. 2052. Davis principally argues that, given the circumstances of this case, Nash's failure to inform Davis before the proffer session that his statements could be used against him if he stood trial fell below an objective standard of reasonableness. According to the government, Nash's failure to warn Davis was objectively reasonable because Nash did inform Davis that the plea offer hinged on his agreement to testify against his siblings

and because it was not foreseeable to Nash that Davis would not follow through on his part of a "stunningly favorable plea and sentencing agreement." Gov't Br. at 10. Mindful that we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *see Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, we nonetheless agree with Davis.[6]

Because Davis was unaware that his proffer statements could be used against him and because Davis was a young first-time offender who had an apparent emotional connection with the individuals he was asked to testify against, counsel was obliged to inform his client of the consequences of proffering in order to accord with prevailing professional norms. By failing to inform Davis of this crucial aspect of the plea bargain, Nash breached his duty to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Model R. of Prof'l Conduct R. 1.4(b) (1983); *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (acknowledging the role of other ABA standards as " 'guides to determining what is reasonable' ") (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052).

■ Our case law confirms that counsel has a professional obligation to adequately inform her client about the considerations that are relevant to her client's decision to accept or deny a plea bargain. In *Gordon*, we affirmed the district court's finding of ineffective assistance, ruling that counsel's performance fell below an objective stan-

---

6.  We note that on November 25, 2003, the district court held a hearing in which Nash was provided with an opportunity to testify, in compliance with the law of the Circuit. *See. e.g., Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir.1998) ("[A] district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs.").

dard of reasonableness because, when advising his client about whether to accept a proposed plea, counsel "grossly" underestimated defendant's potential sentencing exposure at trial. *Gordon*, 156 F.3d at 380. We acknowledged that this was an error that related to a key consideration for defendant in making an informed decision, stating that "knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *Id.* (quoting *United States v. Day*, 969 F.2d 39, 43) (3d Cir.1992) (internal alteration notation omitted).

In *Purdy v. United States*, 208 F.3d 41 (2d Cir.2000), we ruled that, even though counsel "never advised [his client] in so many words" about whether or not to plead guilty, *id.* at 47, he provided effective counsel because he advised his client on the factors necessary to allow defendant to make an informed decision, such as the strength of the government's case and other benefits of pleading guilty, *id.* at 47–48. Even though Nash did properly inform Davis about his potential sentencing exposure at trial, the requirement that Davis testify against his siblings if necessary, and the strength of the government's case, he nonetheless failed to fulfill his professional duty to assist Davis in making an informed decision because he neglected to apprise Davis of a crucial aspect of the agreement—that anything Davis said during the proffer session could be used against him if he did not satisfy all of the conditions of the plea offer, including following through with his testimony. We consider this to be a crucial aspect of the plea bargain, in part, because it essentially constituted a waiver of Davis's right against self-incrimination—an important constitutional protection. *See generally Boykin v. Alabama*, 395 U.S. 238, 243 n. 5, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464,

58 S.Ct. 1019, 82 L.Ed. 1461 (1938)) (stating that privilege against self-incrimination is a constitutional right that will not be waived by defendant's guilty plea without some showing of defendant's "intentional relinquishment or abandonment" of that right).

The circumstances, viewed from Nash's perspective at the time, clearly indicated Davis was not aware that he was waiving his constitutional right against self-incrimination by accepting the plea offer. The record indicates that Davis was not otherwise informed, by law enforcement or previous experience, that his proffer session statements could be used against him at a subsequent trial. This court has indicated that a defendant's lack of experience and knowledge of his rights are relevant to determine whether counsel's performance fell below a standard of reasonableness. In *Purdy*, 208 F.3d at 45, for instance, we found that "defendant's comprehension of the various factors that [would] inform his plea decision" was relevant to the court's assessment of whether or not counsel's performance was objectively reasonable under the circumstances. Davis's lack of awareness made it crucially important that Nash inform Davis about the gravity of the right he was asked to forfeit in exchange for a plea agreement.

The circumstances of this case also suggested that Davis might later decide not to testify and, as a result, be forced to stand trial; therefore, the requirement that Davis provide statements that could be used against him at such a trial was a particularly risky aspect of the plea bargain. In addition to the relationship between Davis and Sheron suggested by the facts of the crime itself, Nash himself acknowledged that he was cognizant of the emotional attachment between Davis and his siblings, stating that he knew "for a fact" that "psychologically, [Davis] had at-

tachments to foster family members." Davis's apparent emotional attachment to his siblings, combined with his obvious lack of familiarity with the legal system, should have compelled Nash to inform Davis that his statements could be used against him if he failed to testify against his siblings. In order for Davis to be fully informed about the plea, Nash was obligated to inform Davis about both the benefits and the consequences—under all reasonably likely scenarios—of the plea offer.

By failing to warn Davis of this crucial aspect of the plea offer, Nash deprived Davis of the ability to make a fully informed decision for himself. This runs counter to prevailing professional norms which require that a defendant make the ultimate, informed choice about whether or not to accept a plea offer and that a lawyer not exert undue influence on a defendant's decision. *See Purdy*, 208 F.3d at 45. Because the decision of whether or not to accept a plea offer and all of its conditions is ultimately Davis's decision to make, Nash's heavy focus on his view of the benefits of proffering should also have included information about the major risks associated with proffering.[7]

The circumstances clearly indicated that Davis was unaware that the statements could be used against him if he had to stand trial and that he had some personal considerations that made it difficult for him to comply with the requirement of the plea that he testify against his siblings. By ignoring these pertinent circumstances, Nash's performance fell below an objective standard of reasonableness.

Our case law acknowledging that attorneys sometimes have strategic reasons for decisions that are later proven to be un-

successful is inapposite in this case because Nash could have had no appropriate strategic reason for failing to inform his client of the risks of proffering. *See. e.g., United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir.1999) ("[A]ctions or omissions that might be considered sound trial strategy do not constitute ineffective assistance.") (internal quotation marks omitted); *see also United States v. Bayless*, 201 F.3d 116, 130–31 (2d Cir.2000) (finding that counsel's decision not to file timely motion for recusal was not unreasonable because it might have been based on strategic considerations). The government's argument that Nash did not inform Davis in part because Davis did not appear very anxious before his proffer session, is also unavailing in light of the fact that Davis was unaware of the risks he was about to take in proffering.

Based on the above considerations, we hold that the performance of Davis's counsel was objectively unreasonable and that any holding to the contrary would be an unreasonable application of the first prong of the Supreme Court's *Strickland* test.

## II.   Strickland's *Second Prong*

◼ While we conclude Davis should prevail with respect to *Strickland*'s first prong, he must also establish that he was prejudiced by his counsel's ineffective assistance. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. The burden is on the defendant to show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "The level of prejudice [Davis] need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that

---

7. Our insistence that attorneys inform their clients about the risks associated with plea bargaining should not be read as discouraging lawyers from advising clients, after laying

out all the benefits and risks, that, in the attorney's professional opinion, one course is better than the other.

'more likely than not altered the outcome in the case.'" *Lindstadt v. Keane,* 239 F.3d 191, 204 (2d Cir.2001) (quoting *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052). The district court's determination that Davis did not satisfy *Strickland*'s prejudice prong is a mixed question of law and fact. *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052. We review "mixed questions of law and fact either *de novo* or under the clearly erroneous standard depending on whether the question is predominantly legal or factual." *United States v. Selioutsky,* 409 F.3d 114, 119 (2d Cir.2005) (citation omitted).

The district court's holding regarding lack of prejudice was principally based on its underlying factual finding that Davis would still have proffered, and would still have made self-incriminating statements to law enforcement officials, even if he had been aware of the fact that his statements could be used against him in the event that he stood trial. *Davis,* No. 01–7936 at 20. The district court found that Davis's claim that he would not have accepted the plea if it was conditioned on the proffering of unprotected statements was purely "self-serving, post-conviction testimony." *Id.* at 19 (quoting *Gordon,* 156 F.3d at 380). We do harbor some doubts about this factual finding. Davis, properly informed about the condition that he proffer unprotected statements and the concomitant risks, might very well have refused the proposed plea offer. Even when faced with the potential of a long prison sentence if he went to trial, Davis, who was emotionally connected to Shamel and Sheron, might have opted to proceed directly to trial or to condition his acceptance of the plea on receiving a guarantee that his proffer session statements would not be used against him if he later chose not to testify. Our doubts, however, are not sufficient to permit us to conclude that the district court's factual determination was clearly errone-

ous. Our review of a district court's factual findings is highly deferential. We must accept the district court's account if it is "plausible in light of the record viewed in its entirety" and we cannot reverse simply because we would have come to a different conclusion if we had "been sitting as the trier of fact." *See Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

The district court's determination that Davis would have accepted the plea offer and participated in the proffer sessions regardless of his awareness of the risks is plausible because, at the time when Davis was making this decision (1) Davis knew, from Nash, that there was significant evidence against him and that his only available defense at trial "would have been if a jury chose not to believe the testimony of other witnesses," *Davis,* No. 01–7936 at 19 (quoting Pet'r Post–Hr'g Br. at 4); (2) the government had placed a generous offer on the table, a plea to manslaughter instead of murder; and (3) Davis was communicating to some extent that he was capable of testifying against Sheron and Shamel if necessary.

In light of these three relevant circumstances, it was not unreasonable for the district court to find that Davis would not have acted any differently if he had been properly informed by Nash. Davis argues that the DA's "lack of a strong case" against Davis before the initiation of the proffer sessions "is itself sufficient objective evidence that supports [Davis's] assertion that he would have chosen to stand trial if he had been warned." Davis Br. at 27. This argument lacks merit. When Davis was contemplating the plea offer, it seemed that the government had considerable evidence against Davis, including the testimony of several witnesses and the medical examiner. Moreover, the plea offered Davis the opportunity to potentially receive a sentence of time served for man-

slaughter rather than several sentences of twenty-five years to life for murder. Davis argues that his credibility is bolstered because, at the evidentiary hearing below, he admitted some things that were detrimental to him, and therefore the court should credit his testimony that he would not have accepted the plea if properly informed. This credibility argument is severely undermined by the fact that Davis also admitted at the hearing that he had lied under oath at some point during the underlying proceedings. Davis simply does not offer sufficient evidence to convince us that the district court's finding was clearly erroneous.

Because we find no clear error in the district court's factual determination that Davis would have proffered the statements even if Nash had properly informed him of the consequences, we conclude that Davis has not satisfied *Strickland*'s prejudice prong. Davis has not established a reasonable probability that "but for" Nash's failure to inform Davis about the risks of proffering, Davis would not have accepted the plea. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. We therefore hold that the "ultimate decision[ ]" of the state court, summarily denying Davis's ineffective assistance of counsel claim for lack of merit, was not an "unreasonable application" of *Strickland*. *See Aeid*, 296 F.3d at 62. Accordingly, although we conclude that counsel's failure to warn Davis about the risks of proffering was unreasonable under the circumstances, we affirm the district court's denial of Davis's petition.

## CONCLUSION

For the foregoing reasons, the judgment of the district court denying the writ is affirmed.