Sheron THOMAS, Petitioner,

v.

**Elaine LORD, Superintendent Bedford Hills Correctional Facility, Respondent.**

No. 04–CV–02657 (ADS).

United States District Court,
E.D. New York.

Oct. 31, 2005.

Law Offices of Laura M. Miranda PLLC, New York, NY (Laura Miranda, of Counsel), for the Petitioner.

Thomas J. Spota, District Attorney of Suffolk County, by Anne E. Oh, Assistant District Attorney, Riverhead, NY, for the Respondent.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Sheron Thomas petitions this Court pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus. The Petitioner seeks habeas corpus relief from her December 17, 1997 conviction, following a trial by jury in Supreme Court, Suffolk County, New York, for one count of depraved indifference Murder in the Second Degree. N.Y. Penal Law § 125.25(2) (McKinney's 1995). After conviction, the Petitioner was sentenced on January 14, 1998 to an indeterminate term of 25 years to life. The New York Appellate Division, Second Department, affirmed the conviction, *People v. Thomas,* 302 A.D.2d 616, 755 N.Y.S.2d 312, (2d Dep't 2003), and the New York Court of Appeals denied leave to appeal, *People v. Thomas,* 100 N.Y.2d 566, 795 N.E.2d 50, 763 N.Y.S.2d 824 (2003).

The Petitioner raises the following grounds in this challenge to her state court conviction: (1) ineffective assistance of counsel; (2) insufficient evidence to support a conviction for depraved indifference to human life; and (3) excessive and disproportionate sentence. For the reasons that follow, the Court finds that the Petitioner's arguments are without merit and denies the writ of habeas corpus.

## I. BACKGROUND

On June 27, 1995, at about 9:30 p.m., Frank Olivieri ("Olivieri") died from injuries he sustained after he was brutally beaten with a baseball bat, robbed, and set on fire in the driveway of Sheron Thomas' apartment at 19 Upper Drive, Huntington,

New York. Sheron Thomas ("Sheron" or the "Petitioner") was thirty years old at the time and she had previously dated Olivieri for about four years. At one time they were engaged to be married. However, sometime between November 1994 and April 1995, the two decided to breakup. The decision was, according to Sheron, partially related to her aborted pregnancy of Olivieri's child, the transmission of herpes from one lover to the other, and that fact that his father did not like her because she was black and he was white. However, in the months preceding the crime they occasionally saw each other and she was jealous of the other women he was seeing.

At trial, the government established that Sheron carefully orchestrated the brutal attack on Olivieri. The attacked was carried out by Sheron, her 16 year old foster brother Gordon Davis ("Gordon"), and Gordon's 19 year old half-brother Shamal Thomas ("Shamal"). In order to carry out the attack, Sheron solicited the services of Gordon and Shamal, and also attempted to solicit the help of Tyron Thomas ("Tyron"), who was the brother of Shamal and Gordon. Tyron testified that a week before the crime, Sheron solicited his aid in a plan to beat up Olivieri. Tyron Thomas was suppose to participate in the attack, but never went with his two brothers. Instead, it was decided that Shamal and Gordon would take care of the attack on Olivieri.

Nikkita Cumberbatch ("Nikkita"), who at the time was dating Shamal, testified that she met up with Sheron, Shamal, and Gordon at Central Islip High School on the day of the crime. At the school, Sheron instructed Shamal and Gordon to make sure that they take Olivieri's wallet so that the attack would look like a robbery. On June 27, 1995, at approximately 7:30 p.m., the four of them left the school and pro-

ceeded to Sheron's apartment where she told them that Olivieri was coming at approximately 9:30 p.m. to pick up their cat.

While at the apartment, Nikkita testified that she saw Sheron put on yellow gloves and prepare a mixture of lighter fluid in the kitchen sink. Sheron also tested the flame of a butane lighter to make sure it was working. Sheron told them that she would "set [Olivieri] on fire and put it out really quick so he would know not to play with fire anymore." (Trial Tr., Dec. 3, 1997, at 247.) She also had an aluminum bat and she wondered if it was sufficient to hit Olivieri hard enough. Sheron gave Gordon and Shamal the bat and instructed them on where to hide in the bushes. She told them that she had unscrewed the outside light so that Olivieri could not see anyone hiding and waiting for him.

At 9:00 p.m., Sheron told Nikkita to leave and move her car out of the driveway and around the corner so that Olivieri could park in the driveway. While waiting in the car, Nikkita observed Olivieri arrive at the apartment and park his car in the driveway. He entered the apartment not knowing that there were two men hiding in the bushes waiting to attack him. When he left the apartment several minutes later, he was attacked from behind by Gordon and Shamal. They savagely beat him in the head with the baseball bat and kicked him while he was face down on the ground. They took his wallet and ran off to Nikkita, who was waiting in her parked car down the street.

While Nikkita waited in the car listening to the radio, she heard a thud. A couple of minutes later she saw Shamal and Gordon running to her car holding the baseball bat. In the car Gordon had Olivieri's wallet and said "did you see him hit the ground." Nikkita testified that she did not see any fire or flames as they drove away from the house. They took the twenty

dollars in the wallet and bought some marijuana, which they smoked that night. They also disposed of the wallet in a dumpster in Brentwood, and cleaned the blood off the bat before hiding it in Nikkita's closet.

Meanwhile, as Olivieri laid face down on the ground Sheron came out of the house, poured the lighter fluid on him, and set him on fire. Sheron's landlord Jane Roberts ("Jane") was walking back to the house where Sheron's apartment was located after having visited with her neighbor. Jane noticed someone gingerly walking along the bushes in the front of the neighbor's house. When Jane approached the person she realized it was Sheron, and she asked her what was wrong. At that point, Sheron started screaming "Frankie is on fire!" They both ran over to the front of 19 Upper Drive where they observed flames fully engulfing Olivieri's body, as well as a station wagon that was parked in the driveway, a fence, and some bushes. At one point the flames were almost fifteen feet high. Sheron, along with the numerous neighbors that quickly gathered attempted to suppress the fire with extinguishers, garden hoses, and blankets, but they were unsuccessful. Sheron was repeatedly stating that she had previously warned Olivieri that this sort of thing might happen if he continued "messing around with someone's girl." (Trial Tr., Nov. 20, 1997, at 871).

Eventually, the fire department arrived and put out the fire. After the flames were extinguished, Olivieri was taken to the hospital where he died within a half hour. In addition to having third degree burns over ninety percent of his body, he had sustained fractured bones in the face, nose, and ribs, and the back of his skull was also fractured in several places. The medical examiner would later determine that his death could have been caused by either the head injuries or the burns.

At the crime scene, the investigation that followed determined that Olivieri had been doused with a mixture similar to that of lighter fluid and gasoline. Detectives found a yellow rubber glove, sandals, and a plastic bottle near the outside of the front door of the apartment that all tested positive for the same lighter fluid mixture. Nikkita testified that the glove found by the front door looked like the one that Sheron wore when she was handling the lighter fluid prior to the attack. There was no indication that the wallet or any of its contents came into contact with lighter fluid or any other flammable substance. Arson detectives also ruled out any possibility that the station wagon, or the gasoline from it, started the fire that contributed to Olivieri's death.

Sheron Thomas was questioned several times before being arrested in November 1995. Early in the morning on July 28, 1995, Sheron spoke with Detective Mercer in the bedroom of her landlord's house. She said that Olivieri had come to her house to pick up their cat; that he had collected some of the cat's things and brought them out to the car. While he went to his car, she decided to clean the cat box in the bathroom. While cleaning the liter box she realized that Olivieri was gone too long so she went to see where he was. That is when she found him in on the driveway on fire.

Sheron's version of the events that night remained constant through rounds of questioning. When she subsequently spoke to Olivieri's mother, her story was consistent except that she stated that she heard him scream. When Sheron was further questioned by police during the day on July 28, 1995, she repeated the same story to Detective Schreiber and added that she could not hear anything because the stereo was

on. Also on July 28, 1995, Sheron visited Olivieri's father and repeated the same story but omitted the part about him screaming.

On September 8, 1995, detectives picked up Sheron for questioning as she left her home to go to work. Sheron was taken to police headquarters and interrogated by several detective for thirteen hours. She was given a polygraph exam. At one point, Detective Mercer lied to Sheron, telling her that her boyfriend had told them that she had hit him before he died. Detective Mercer testified that Sheron had made an oral admission that she hit Olivieri, but refused to confess to the crime.

After obtaining statement from Nikkita and the other codefendants, Sheron was arrested in November 1995 and charged with three counts of second degree murder for the homicide of Olivieri. Prior to trial, the court conducted a *Huntley* hearing at which the oral and written admissions of the Petitioner were deemed admissible. During jury selection, the Petitioner asserted a *Batson* challenge when the prosecutor exercised a peremptory challenge to the sole African–American female juror. The court summarily denied the *Batson* challenge because there was no pattern of excluding African–Americans from the jury.

After being convicted by a jury and sentenced to 25 years to life, the Petitioner appealed to the New York State Supreme Court Appellate Division, Second Department, arguing (1) that the prosecutor's peremptory challenge to remove the sole black juror was a violation of the Petitioner's equal protection rights; (2) ineffective assistance of counsel; (3) denial of a fair trial by prosecutions inflammatory summation; (4) insufficiency of the evidence; and (5) that the sentence was excessive. The Appellate Division ruled that the Petitioner failed to establish a *Batson* violation;

that the verdict was not against the weight of the evidence; and that the sentence was not excessive. The court found the Petitioner's other contentions either unpreserved or without merit. *Thomas*, 302 A.D.2d at 617, 755 N.Y.S.2d at 313. As stated above, the New York Court of Appeals denied leave to appeal. *See People v. Thomas*, 100 N.Y.2d 566, 795 N.E.2d 50, 763 N.Y.S.2d 824 (2003).

## II. *DISCUSSION*

### A. EXHAUSTION

■ In the interest of comity and in keeping with the requirements of 28 U.S.C. § 2254(b), federal courts will not consider a constitutional challenge that has not first been "fairly presented" to the state courts. *See Ayala v. Speckard*, 89 F.3d 91, 94 (2d Cir.1996) (citing *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)); *see, e.g., Rhines v. Weber*, —— U.S. ——, ——, 125 S.Ct. 1528, 1533, 161 L.Ed.2d 440 (2005).

■ Here, based on the record before the Court, it appears that the Petitioner has exhausted all of her state court remedies. The Petitioner presented her constitutional challenges to all available state appellate courts and the state courts adjudicated that claim on the merits. *See Thomas*, 302 A.D.2d at 617, 755 N.Y.S.2d at 313; *People v. Thomas*, 100 N.Y.2d 566, 795 N.E.2d 50, 763 N.Y.S.2d 824 (2003).

### B. STANDARD OF REVIEW OF STATE COURT DETERMINATIONS

The Antiterrorism and Effective Death Penalty Act (the "AEDPA") provides that a federal court may grant habeas relief to state prisoners with respect to any claim that was adjudicated on the merits in state court proceedings only if

the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see DeBerry v. Portuondo,* 403 F.3d 57, 66 (2d Cir.2005); *Wade v. Herbert,* 391 F.3d 135, 140 (2d Cir.2004).

■ A state court's factual findings enjoy a "presumption of correctness" that the petitioner must rebut by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Under the AEDPA standard, the court does not decide "whether the state court correctly interpreted the doctrine of federal law on which the claim is predicated, but rather whether the state court's interpretation was unreasonable in light of the holdings of the United States Supreme Court at the time." *Brown v. Greiner,* 409 F.3d 523, 533 (2d Cir.2005); *see also Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

## C.  THE PETITIONER'S CLAIMS

### 1.  Ineffective Assistance of Counsel

#### (a)  Legal Framework

In determining whether the state court's denial of Sheron's appeal relied on an unreasonable application of federal law regarding ineffective assistance of counsel, the court looks to *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for the relevant clearly established federal law. *Davis v. Greiner,* 2005 WL 2500690, *5 (2d Cir. Oct.11, 2005); *Cox v. Donnelly,* 387 F.3d 193, 197 (2d Cir.2004); *see also Williams v. Taylor,*

529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

■ When, as here, the state courts summarily rejects an ineffective assistance claim on the merits, the court "must focus on the ultimate decisions of those courts, rather than on the courts' reasoning." *Aeid v. Bennett,* 296 F.3d 58, 62 (2d Cir. 2002); *Sellan v. Kuhlman,* 261 F.3d 303, 311–12 (2d Cir.2001) ("[W]hen a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent.").

To establish ineffective assistance of counsel, a petitioner must demonstrate: (1) that her counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that she was prejudiced by her counsel's deficient performance. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d 674. In applying the above two-prong test, "judicial scrutiny of counsel's performance must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. The relevant inquiry focuses "on the fundamental fairness of the proceeding whose results are being challenged." *Id.* at 696, 104 S.Ct. at 2069. "The court's central concern is not with 'grading counsel's performance' but with discerning 'whether despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" *United States v. Aguirre,* 912 F.2d 555, 560 (2d Cir.1990) (quoting *Strick-*

*land,* 466 U.S. at 696–97, 104 S.Ct. at 2069).

The burden is on the petitioner to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Indeed, as the Supreme Court has noted, "there are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

With respect to the second prong, the petitioner can only establish prejudice if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Billy–Eko v. United States,* 8 F.3d 111, 114 (2d Cir.1993). In this case the Petitioner argues that her pre-trial representation as well as her counsel during the trial were ineffective. The Court will analyze each claim separately.

### (b) As to Pretrial Counsel

■ The Petitioner asserts that her pre-trial counsel was ineffective for failing to request a *Dunaway* hearing to argue that her confession be suppressed for lack of probable cause to arrest and that her counsel failed to file pretrial motions. In addition, on December 16, 1997, one month after the pre-trial hearings, the Petitioner's pretrial counsel, Glenn O. Vickers ("Vickers"), was suspended from the practice of law. He failed to inform the court and the Petitioner that he had been convicted of sexual abuse in the third degree, a class B misdemeanor, prior to taking on the representation of the Petitioner. *See In re Vickers,* 227 A.D.2d 76, 651 N.Y.S.2d 157 (2d Dep't 1996).

■ The Petitioner argues that a *Dunaway* hearing should have been requested because during the *Huntley* hear-

ing Detective Timmons stated that he "guessed" Sheron was in custody at the time of her interrogation. In *Dunaway v. New York,* the Supreme Court held that the police violated the Fourth and Fourteenth Amendments when, without probable cause to arrest, they seized the petitioner and transported him to the police station for interrogation. *See* 442 U.S. 200, 216, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). As a result, when an accused in New York challenges the presence of probable cause to arrest, the accused is, under certain circumstances, entitled to a hearing on whether to suppress an admission that was obtained after the arrest. *Id.; see also* N.Y.Crim. Proc. Law §§ 710.60 (McKinney's 2005); *Lewis v. Bennett,* 328 F.Supp.2d 396, 402 (W.D.N.Y.2004). If the court determines that the defendant made an "involuntary statement," which includes statements obtained after an arrest without probable cause, as well as those obtained in violation of rights secured by the constitution of New York or of the United States, the statement is inadmissible. *See* N.Y.Crim. Proc. Law § 60.45; *People v. Witherspoon,* 66 N.Y.2d 973, 498 N.Y.S.2d 789, 489 N.E.2d 758 (1985); *People v. Chavis,* 147 A.D.2d 582, 537 N.Y.S.2d 875 (2d Dep't 1989); *People v. Wilson,* 143 A.D.2d 786, 533 N.Y.S.2d 313 (2d Dep't 1988).

■ The Court finds that counsel did not err in failing to request a *Dunaway* hearing because the facts and circumstance of the Petitioner's interrogation were fully developed in the lengthy *Huntley* hearing. *See, e.g., Hemphill v. Senkowski* No. 02–7093, 2004 WL 943567, at *15 (S.D.N.Y. May 3, 2004) (finding that counsel was not ineffective for failing to request a *Dunaway* hearing where a *Mapp / Wade* hearing satisfied the same requirement). In New York, a *Huntley* hearing is held if the prosecution intends

to offer a defendant's confession. If the confession is challenged, a hearing is held in which the prosecution has the burden of proving, beyond a reasonable doubt, that a defendant's statement was voluntary. *See People v. Huntley,* 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

At the *Huntley* hearing in this case it was established that Sheron's oral statements on September 8, 1995 were not the product of custodial interrogation or illegal arrest. On that day, the Petitioner voluntarily accompanied the police to headquarters in order to assist in the investigation. She was never restrained, was told she could leave at anytime, and when she did ask to leave the detectives drove her home. At one point in the interview she spoke to her mother and told her that she would be home soon. From the testimony adduced at the *Huntley* hearing, it appears that counsel properly decided that it would be not possible to establish that the Petitioner was arrested or in custody based on these facts. Under these circumstances, counsel properly decided, as a tactical matter, that it would be futile to request a hearing.

■ As to the Petitioner's contention that counsel was ineffective for failing to file pretrial motions, the Court finds this argument totally without merit. A review of the case file reveals numerous motions filed by the Petitioner's counsel of record prior to Vickers' representation. Sheron's pretrial counsel prior to Vickers filed motions for discovery, a bill of particulars, the preclusion of evidence, and to quash a subpoena. Vickers was the Petitioner's third attorney in the case and he correctly did not re-file duplicate motions and demands for discovery. Thus, Vickers' sole oral application for a *Huntley* hearing provided the defense with ample opportunity to attack the admissibility of the proffered evidence by questioning the detectives

about the context and voluntariness of the Petitioner's responses.

■ The Court also disagrees with the Petitioner's argument that Vickers' suspension from the practice of law during his representation rendered ineffective his assistance prior to such suspension. Under similar circumstances, the Second Circuit has held that counsel is "per se" ineffective "in only two situations: when, unknown to the defendant, counsel was, at the time of representation, '(1) not duly licensed to practice law because of a failure to ever meet the substantive requirements for the practice of law, . . . or (2) implicated in the defendant's crimes.'" *Guerrero v. United States,* 186 F.3d 275, 279 (2d Cir.1999) (quoting *Bellamy v. Cogdell,* 974 F.2d 302, 306 (2d Cir.1992)). Neither situation is present here.

In addition, Vickers' suspension from the practice of law had no effect on his representation of the Petitioner during pretrial matters. His suspension was for his prior conviction for a crime that, aside from adversely reflecting on his character, was unrelated to his ability to zealously represent his client and provide her with a rigorous defense. Also, the court promptly replaced Vickers with new counsel as soon as he was suspended from the practice of law.

■ Even assuming that the Petitioner could establish that her pretrial counsel's level of representation fell below an objective standard of reasonableness under prevailing professional norms, she would be unable to prove the second prong of the *Strickland* test, that is, prejudice. Vickers represented the Petitioner at the *Huntley* hearing, at which it was determined that her pretrial admissions would be allowed in evidence. The Petitioner's admissions consisted of three statements: (1) that she hit Olivieri; (2) that she told the police "do what you have to do"; and (3) that "she

doesn't deserve to live ... [a]nd she should die like he did." (*Huntley* Hr'g Tr. at 80)

A review of the record reveals that the jury did not convict the Petitioner on these oral statements alone. Rather, even without these statements there was overwhelming evidence to prove, beyond a reasonable doubt, that the Petitioner committed this crime. Both Nikkita and Tyron testified about how the Petitioner planned the crime and instructed her cohorts. Also, the evidence established that she was the only person at the right place and the right time to set Olivieri on fire. Accordingly, the Court finds the state court reasonably determined that the Petitioner's pretrial assistance of counsel was not ineffective.

### (c) As to Trial Counsel

■ Sheron argues that her trial counsel, Paul Gianelli, Esq. ("Gianelli"), was ineffective because he was not retained on the case until a few weeks before the trial and did not have enough time to prepare for the five week trial. Specifically, she argues that the alleged lack of preparedness became apparent when he appeared unfamiliar with some of the facts and issues presented at the pretrial stage of the case when he made objections during the trial. As an example, the Petitioner cites to the introduction at trial of the fact that she suffers from herpes.

As the Respondent properly points out, the Petitioner's argument that her trial counsel was unprepared lacks any factual basis. Gianelli began his representation of the Petitioner in early 1997, prior to the first trial which occurred in September 1997. The first trial ended in a mistrial. The second trial commenced in November 1997. Therefore, contrary to the Petitioner's claim, Mr. Gianelli had more than eight months to prepare for her defense.

In addition, he had a distinct advantage because he had previously received all the Rosario materials from the first trial and he obtained a preview of the prosecution's case, which included the testimony of several key witnesses.

■ Further, even if counsel's performance had fallen below an objective standard of reasonableness, *Strickland's* prejudice prong would not be satisfied. As discussed earlier, the evidence against Sheron was very strong. Even with the deficiencies alleged by Sheron, there is not a "reasonable probability" that the end result would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, the Petitioner's claims of ineffective assistance at trial are denied.

### 2. As to the Sufficiency of the Evidence for Depraved Indifference Murder

■ Under the Due Process Clause of the of the Fourteenth Amendment and relevant Supreme Court law, proof beyond a reasonable doubt is required to convict a defendant of a crime. *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (holding that proof of a criminal charge beyond a reasonable doubt is required by the Constitution); *In re Winship,* 397 U.S. 358, 362, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (same). Thus, to succeed on a claim based on sufficiency of the evidence, a petitioner must show that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.*

■ Relying primarily on the New York Court of Appeals decision in *People v. Payne,* 3 N.Y.3d 266, 819 N.E.2d 634, 786 N.Y.S.2d 116 (2004), the Petitioner argues that the court improperly submitted the charge of depraved indifference

338

murder to the jury. In *Payne*, the Court of Appeals held that "depraved indifference murder may not be properly charged in the overwhelming majority of homicides that are prosecuted in New York." *Id.* The court explained that a point-blank shooting is ordinarily not a killing that could qualify as depraved indifference murder. *Id.* at 270, 786 N.Y.S.2d 116, 819 N.E.2d 634. Stated otherwise, "[t]he use of a weapon can never result in depraved indifference murder when ... there is a manifest intent to kill." *Id.* at 271, 786 N.Y.S.2d 116, 819 N.E.2d 634.

Pursuant to New York Penal Law § 125.25(2), a person is guilty of depraved indifference murder when "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." *Id.* (McKinney's 1995). In *People v. Gonzalez*, the New York Court of Appeals explained the interplay between intentional murder and depraved indifference murder under New York's homicide statute:

> When a defendant's conscious objective is to cause death, the depravity of the circumstances under which the intentional homicide is committed is simply irrelevant. Nor can the wanton disregard for human life inherent in every intentional homicide convert such a killing into a reckless one. To rise to the level of depraved indifference, the reckless conduct must be " 'so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another' " (*People v. Russell,* 91 N.Y.2d 280, 287, 670 N.Y.S.2d 166, 693 N.E.2d 193 (1998), quoting *People v. Fenner,* 61

N.Y.2d 971, 973, 475 N.Y.S.2d 276, 463 N.E.2d 617 (1984)).

*People v. Gonzalez,* 1 N.Y.3d 464, 468–69, 807 N.E.2d 273, 775 N.Y.S.2d 224 (2004).

In this light, the New York Court of Appeals has consistently recognized depraved indifference murder in instances where "the acts of the defendant are directed against a particular victim but are marked by uncommon brutality—coupled not with an intent to kill ..., but with depraved indifference to the victim's plight." *Payne,* 3 N.Y.3d at 271–72, 786 N.Y.S.2d 116, 819 N.E.2d 634; *see, e.g., People v. Mills,* 1 N.Y.3d 269, 804 N.E.2d 392, 772 N.Y.S.2d 228 (2003) (finding depraved indifference murder for the drowning of a twelve year old); *People v. Bryce,* 88 N.Y.2d 124, 666 N.E.2d 221, 643 N.Y.S.2d 516 (1996) (finding depraved indifference murder for fracturing the skull of a seven-week-old baby); *People v. Best,* 85 N.Y.2d 826, 648 N.E.2d 782, 624 N.Y.S.2d 363 (1995) (finding depraved indifference murder for repeatedly beating a nine year old); *People v. Kibbe,* 35 N.Y.2d 407, 321 N.E.2d 773, 362 N.Y.S.2d 848 (finding depraved indifference murder where the defendant robbed an intoxicated victim and forced him out of a car on the side of a dark, remote, snowy road partially dressed and without shoes in subfreezing temperatures); *People v. Poplis,* 30 N.Y.2d 85, 281 N.E.2d 167, 330 N.Y.S.2d 365 (1972) (finding depraved indifference murder where defendant inflicted continuous beating on a three-year-old child).

In addition to acts evincing uncommon brutality, depraved indifference murder may also be properly charged where "a single homicidal act committed against one individual ... constitute[s] both an intentional crime and a reckless one, provided only that the intent harbored by the perpetrator is other than an intent to kill." *People v. Atkinson,* 21

A.D.3d 145, 799 N.Y.S.2d 125, 132 (2d Dep't 2005). For example, "a defendant may … attack the victim, not with the intent to cause death, but with the intent to cause the victim serious physical injury. The defendant's conduct may nevertheless be such as to create a substantial and unjustifiable risk that the victim will not merely sustain serious physical injury but will die." *Id.* In other words, "a defendant could certainly intend one result—serious physical injury—while creating a substantial and unjustifiable risk that a different, more serious result—death—would ensue from his actions." *Id.* (quotations, citations, and omissions omitted).

Turning to the specific facts of this case, the Court finds that the evidence presented at trial falls squarely into one of these two theories of depraved indifference murder. A review of the record in the light most favorable to the prosecution convinces the Court that a rational factfinder could readily have found the Petitioner guilty beyond a reasonable doubt of depraved indifference murder under New York law.

Notably, the jury was free to credit the evidence of Sheron's statements that she would "set [Olivieri] on fire and put it out really quick so he would know not to play with fire anymore," (Trial Tr., Dec. 3, 1997, at 247), that she had previously warned Olivieri that this sort of thing might happen if he continued "messing around with someone's girl;" and the fact that she was soliciting aid in a plan to beat up—not kill—Olivieri. All of this evidence unquestionably points to her intent to seriously injure Olivieri, but not necessarily kill him.

While at the same time, pouring lighter fluid on a person who had just been severely beaten with a baseball bat and igniting it is undeniably conduct that is "wanton," uncommonly brutal, "deficient in a moral sense of concern," and completely "devoid of regard of the life or lives of others." *People v. Fenner,* 61 N.Y.2d 971, 463 N.E.2d 617, 475 N.Y.S.2d 276 (1984). Such conduct is sufficiently reckless to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another, regardless of whether Sheron knew that her actions would most certainly cause imminent death.

From the evidence in the record, it is clear that the jury could reasonably have found, beyond a reasonable doubt, that the Petitioner, under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct that created a grave risk of death, and that such conduct caused the death of Olivieri. Accordingly, the Court finds that the charging and conviction of depraved indifference murder was not erroneous under clearly established Federal law. The Petitioner's claim in this regard is denied.

### 3. As to the Excessive Sentence Claim

A constitutional claim for excessive sentence cannot prevail where the sentence imposed falls within the range prescribed by state law. *White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992); *Pagan v. Andrews,* No. 02–5739, 2005 U.S. Dist. LEXIS 23146 (S.D.N.Y. Oct. 6, 2005). At the time of the crime in 1995, New York's Penal Law authorized the imposition of an indeterminate term of imprisonment for second degree murder, which was a Class "A–I" felony. N.Y. Penal Law § 125.25 (McKinney's 1995). The law provided that upon conviction of a class A–I felony, the minimum period of an indeterminate sentence of imprisonment must be not less than 15 nor more than 25 years, and the maximum term was life. See *Id.* § 70.00(2)-(3) (1995).

The Petitioner's indeterminate sentence of twenty-five years to life was within the statutory limits set by the New York State Legislature. Although the petitioner was a thirty year old woman with no prior history of violence and was acquitted of the charge of intentional murder, the court's exercise of discretion in imposing a twenty-five years to life sentence, rather than the minimum sentence of fifteen to life that could have been imposed, was permissible under New York law. Based on the above, the Court finds that Pagan's claim that her sentence is excessive, and, therefore, must be altered through habeas corpus relief, is without merit.

### III. *CONCLUSION*

Based on the foregoing, the Court finds that the state courts' determinations were not contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d). Accordingly, the petition for a writ of habeas corpus is DENIED.

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure and 28 U.S.C. § 2253(c)(2), a certificate of appealability is DENIED, as the Petitioner fails to make a substantial showing of a denial of a constitutional right. *Miller–El v. Cockrell*, 537 U.S. 322, 336, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir.2000).

The Clerk of the Court is directed to close this case.

**SO ORDERED.**